**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**RHONDA W.,**

        **Plaintiff,**

    **v.**                        **Civil Action 2:20-cv-5931
                                       Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

        **Defendant.**

**<u>OPINION AND ORDER</u>**

Plaintiff, Rhonda W., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). The parties in this matter consented to the Undersigned pursuant to 28 U.S.C. § 636(c). (Docs. 6, 7). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff protectively filed her application for DIB on February 12, 2018, alleging that she was disabled beginning January 15, 2015, due to a back injury, right wrist injury and knee injury (Tr. 177–80, 200). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a video hearing on November 19, 2019. (Tr. 30–73). The ALJ denied benefits in a written decision on March 4, 2020. (Tr. 12–29). That became the final decision of the Commissioner when the Appeals Council denied review. (Tr. 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on November 17, 2020 (Doc. 1), and the Commissioner filed the administrative record on May 4, 2021 (Doc. 14). Plaintiff filed her Statement of Errors (Doc. 17) on July 2, 2021, and Defendant

filed an Opposition (Doc. 21) on September 30, 2021. Plaintiff filed her Reply on October 29, 2021 (Doc. 25). Thus, this matter is now ripe for consideration.

## A. Relevant Hearing Testimony

The ALJ summarized the testimony from Plaintiff's hearing:

[Plaintiff] alleges that her ability to work is limited due to back injury, right wrist injury, and knee injury (Exhibit 1E). At the hearing, [Plaintiff] testified that she stopped working in January 2015 due to the pain she was experiencing, which prevented her from being able to perform her job duties. She alleged she had no problems sitting or walking, but was unable to walk and stand for long periods (Hearing Testimony).

[Plaintiff] testified that she is presently able to sit except that it feels like she is sitting on bricks and that she has to get a chair to move things. She further testified that she could only stand for so long, but off the top of her head could not quantify how long, but later assumed she could stand for 30 minutes when asked by her attorney. When shopping, she said she uses the cart as a walker because she feels as if she will fall. She testified that she is unable to walk even to the car now and that she needs a handicapped sticker. She further testified to problems lifting due to right wrist. She said that she could lift a gallon of milk but not carry it. She said that right hand is hurting her and weak presently. She is left-hand dominant. She rated the severity of her back pain an eight (8) to 10 on a one (1) to ten pain-scale, with 10 being the worse. She testified that she could not lift a frying pan. When the undersigned asked her, she said she was only saying she had a back, wrist and knee injury. To her attorney she said she had neck pain and she felt as if she had been thrown out of a moving car on the freeway when she had a fall at work. When asked by her attorney, she said she had migraine headaches and after that, she started having cloudiness but has not seen a psychiatrist. She testified that only recently she is getting a battery of tests. According to [Plaintiff], she said the internal medicine consultative examination was done after an examination where the doctor told her that she was using the cane on the wrong side (Hearing Testimony). She alleges that she falls often and that she has one leg longer than the other and her primary physician was her chiropractor. She also testified that she had filed a workers compensation claim and the doctors stated that she could go back to work. She alleges that the doctors misdiagnosed her with a strain and a sprain. When her attorney asked her why she did not go back to work when the workers compensation doctors told her she could go back to work, she said she had pain and could not sleep and therefore could not get out of bed.

(Tr. 20–21).

## B. Relevant Medical Evidence

The ALJ summarized the relevant medical records as follows:

In terms of [Plaintiff]'s alleged degenerative disc disease, lumbar, the medical evidence of record shows [Plaintiff] had an accident a work on January 15, 2015 during which she slipped and fell on a wet floor and injured her back (Exhibit 3F/117, 124).

As discussed above, David L. Louis, M.D., saw [Plaintiff] on June 3, 2015. On physical examination, Dr. Louis noted that [Plaintiff] walked with the aid of cane and an antalgic gait. Straight leg raise test was positive for pain in the left buttock at 90 degrees. [Plaintiff] also had tenderness in the sacroiliac joint (Exhibit 3F/118). Dr. Louis also reported [Plaintiff] had reportedly undergone an EMG that showed neuropathic changes. Dr. Louis further noted that records from Mr. Carroll, a chiropractor, indicate that x-rays of [Plaintiff]'s lumbar spine showed degenerative disc disease at the L5-S1 level and scoliosis (Exhibit 3F/120).

Subsequently, [Plaintiff] complained of upper thoracic, left cervical dorsal, mid thoracic, lower thoracic, lumbar, left sacroiliac, sacral, right posterior wrist and left posterior knee pain and received treatment for these impairments in 2015 (Exhibit 3F).

During chiropractic therapy on July 13, 2015, [Plaintiff]'s primary complaint was radiating lumbar pain and discomfort to left sciatic and gluteus maximus. She described the discomfort as, "stiff and sore." On a scale of 0 to 10 with 10 being the worst, she described the intensity of the discomfort as being an eight (8) and noticeable 33% of the time in the mornings. She further described that the symptoms had been present since the January 15, 2015 injury; and that the symptoms became aggravated by almost any movement. On examination, [Plaintiff] demonstrated positive bilateral straight leg raise test (Exhibit 3F/13-15).

[Plaintiff] presented to the emergency department (ED) on August 10, 2015. She reported that she had attended a court hearing that day regarding her worker's compensation, and that the judge had advised her that she was approved to have a[n] MRI performed. She complained of upper and lower back pain, and lower pelvic pain, and requested that the ER doctor order the MRI. She informed that she had taken ibuprofen occasionally for the back pain with minimal relief. Other than her back pain, she denied any other injury or complaint at the time (Exhibit 1F/4, 7).

It was specifically noted that she ambulated independently, that is without a cane or other assistive device. On examination by a physician, it was reported that she had no neurological deficits on exam and there were no red flags suggestive of cord compression or cauda equine syndrome. She had full strength for flexion and extension of the bilateral lower extremities, and the bilateral patellar DTRs was normal. Straight leg raise was negative bilaterally. Sensation was grossly intact in the bilateral lower extremities. She was able to come up on her toes, back of heels

without footdrop. Examination of [Plaintiff]'s back only revealed tenderness with palpation across the muscular lower back, greater on the left than the right but no midline bony spine tenderness, although the physician noted it was difficult to assess [Plaintiff] due to her obese habitus (Exhibit 1F/9). [Plaintiff]'s BMI was noted to be 45 (Exhibit 1F/8). [Plaintiff] informed that she had no primary care physician and had only been receiving chiropractic care for her impairments. The physician informed [Plaintiff] that he could not order an MRI but that since she had private insurance, she should contact the insurance carrier. [Plaintiff] was prescribed a small number of Norco and discharged (Exhibit 1F/9).

(Tr. 21–22).

Next, although [Plaintiff] has received treatment for the allegedly disabling impairment(s) during the period in issue, that treatment was essentially routine and/or conservative in nature. [Plaintiff] mostly received chiropractic treatment at Buckeye Physical Medicine and Rehab from January 2015 to July 2015 (Exhibit 3F). Further, [Plaintiff]'s chiropractor reported that [Plaintiff] tolerated the rehabilitation very well (Exhibit 3F/53), and she responded as expected to the treatment she received (Exhibit 3F/19, 21-22, 27, 29, 31-39, 44-50, 53, 56-57, 59, 61-62, 67, 69, 71, 73. 75, 77-80, 85, 87, 89, 91, 93, 95, 97, 99, 101, 104, 106, 112, 114). [Plaintiff]'s prognosis also improved from "guarded" (Exhibit 3F/127) to "good" (Exhibit 3F/42). Additionally, [Plaintiff] testified that her worker's compensation doctors cleared her to return to work (Hearing Testimony).

The medical evidence of record further shows that although Dr. Louis noted [Plaintiff] walked with the aid of cane during physical examination on June 3, 2015, he also noted that [Plaintiff] held the cane in her left hand, but that her antalgic gait was to the left. As well, while straight leg raise testing was positive for pain in [Plaintiff]'s buttock, the test was negative for radiculopathy (Exhibit 3F/118). Dr. Louis also noted that the sacroiliac tenderness was "subjective" in nature (Exhibit 3F/119). As well, despite Dr. Louis acknowledgement that [Plaintiff] had reportedly undergone an EMG that showed neuropathic changes, he also noted that it was without evidence of radiculopathy. Further, Dr. Louis noted that the degenerative disc disease of the lumbar spine and scoliosis noted on x-rays were to have likely pre-existed [Plaintiff]'s January 15, 2015 injury; and were not directly related to the January 15, 2015 injury (Exhibit 3F/120). According to Dr. Louis, [Plaintiff]'s prognosis was "good"; [Plaintiff]'s "self-limiting" soft tissue conditions could have been expected to resolve within approximately four (4) to eight (8) weeks; and that [Plaintiff] had reached maximum medical improvement as directly related to the January 15, 2015 injury (Exhibit 3F/120-121).

***

Moreover, although [Plaintiff] demonstrated positive bilateral straight leg raise test during a chiropractic session on July 13, 2015, [Plaintiff] reported that her symptoms were decreased by soaking in a bath and stretches (Exhibit 3F/13). As

aforementioned, examination of [Plaintiff]'s back during the emergency department visit on August 10, 2015 revealed no midline cervical/thoracic/lumbar sacral tenderness to palpation. There were also no deformities or step[-]off.

Additionally, straight leg raise test was negative bilaterally. As well, [Plaintiff] ambulated to the examination room independently, without a cane. She was able to come up on her toes, back on her heels without footdrop (Exhibit 1F/9). Notably, during [Plaintiff]'s visit with Dr. Cannone on August 18, 2015, she did not complain of low back pain. On examination, despite exhibiting tenderness along the medial aspect of the left knee, [Plaintiff] did not require the use of a cane. There was no instability with varus/valgus, drawer, or Lachman testing (Exhibit 2F/5).

The undersigned notes that the medical evidence of record contains office visits to OhioHealth Primary Care Physicians (hereinafter "OhioHealth) beginning on October 15, 2015, one month after her date last insured, at which time [Plaintiff] sought to establish care (Exhibit 5F/130). The doctor instructed [Plaintiff] that work related injury care could not be provided at OhioHealth since she had BWC coverage; and that all of her work[-]related injury concerns should be addressed with her BWC provider (Exhibit 5F/149).

Additionally, diagnostic tests do not support the severity of [Plaintiff]'s alleged symptoms to the extent alleged. A[n] MRI of [Plaintiff]'s lumbar spine was performed on September 15, 2017, which showed no disc herniations, no impingement on the thecal sac, and the neural foramina were patent (Exhibit 4F/13). The undersigned notes that although the lumbar MRI was performed many years subsequent to [Plaintiff]'s DLI, this is significant because [Plaintiff] was reportedly approved in 2015 to undergo an MRI (Exhibit 3F/2). This suggests that the symptoms may not have been as serious as has been alleged in connection with this application and appeal, as [Plaintiff] failed to follow-up on recommendations made by a physician. Nevertheless, the objective evidence in the record supports the residual functional capacity.

(Tr. 22–24).

## C. The ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirement through September 30, 2015, and had not engaged in substantial gainful employment during the period from her alleged onset date of January 15, 2015, through her date last insured of September 30, 2015. (Tr. 18). The ALJ determined that through the date last insured, Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine with scoliosis; left knee degenerative joint disease.

(*Id.*). The ALJ, however, found that, through the date last insured, none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (Tr. 20).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ found that:

After careful consideration of the entire record, the [ALJ] finds that, through the date last insured, the [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and occasional climbing of ladders, ropes, or scaffolds.

(*Id.*).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 22).

As for the relevant opinion evidence, the ALJ found,

On initial determination in April 2018 and on reconsideration in August 2018, after considering [Plaintiff]'s subjective pain along with possible tear of her medial meniscus, the State Agency's medical consultants opined that on or prior to September 30, 2015, [Plaintiff] retained the physical residual functional capacity to perform medium work, except for frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and occasional climbing of ladders, ropes, or scaffolds (Exhibits 1A and 3A). This is not a regulatory reason to find limitations. There must be a medically determinable impairment on which to base the assessed limitations. Thus, the undersigned finds the State Agency's medical consultants' opinions non-persuasive. Notwithstanding, the evidence of record now demonstrates that [Plaintiff] does have severe impairments, which limited her ability to work and these impairments and their limiting effects have been considered fully.

Notably, on reconsideration in, the State Agency's medical consultant noted that [Plaintiff]'s representative reported that [Plaintiff] did not have any more medical sources prior to [Plaintiff]'s date last insured, and that if she did come across another source, then she would contact DDS and update [Plaintiff]'s record. However, [Plaintiff]'s representative finally submitted more medical records in October 2019. Therefore, the State Agency's medical consultant on reconsideration could not have considered these records due to the representative's non-submission.

Next, after conducting the physical examination of [Plaintiff] on June 3, 2015, Dr.

6

Louis opined [Plaintiff] was capable of full duty work (Exhibit 3F/121). While the undersigned concurs with Dr. Louis in that [Plaintiff] was capable of working during the period in issue, Dr. Louis fails to provide specific restrictions regarding [Plaintiff]'s functional ability. Therefore, the undersigned finds his opinion only somewhat persuasive.

On August 19, 2015, Michael B. Cannone, DO opined [Plaintiff] should remain off work until after her MRI was completed and she returned to his office for follow-up visit (Exhibit 3F/2). The undersigned only finds this opinion somewhat persuasive, as Dr. Cannone only intended [Plaintiff] remain off work on each occasion until he made further update of her medical condition and not permanently.

In a Reasonable Accommodation Inquiry dated April 20, 2015, Greg Carroll, DC opined [Plaintiff] was unable to return to work or perform work in a different position due to her inability to stand for long periods, lift, twist or bend (Exhibit 3F/8). Mr. Carroll noted that [Plaintiff] was making improvement with treatment. Therefore, even though he could not provide a return[-]to[-]work date for [Plaintiff], it appears he was confident that she would eventually be able to return to work given her improvement and this opinion regarding [Plaintiff]'s inability to work is a temporary opinion. Thus, the undersigned finds Mr. Carroll's opinion non-persuasive.

On August 19, 2015, Dr. Cannone opined [Plaintiff] was unable to work because she was unable to stand for long times and could not lift, bend or twist (Exhibit 3F/2, 5). As discussed above, examination of [Plaintiff]'s bilateral lower extremities (BLE's) on June 3, 2015 revealed normal range of motion of both knees without effusions. There was no instability. Trendelenburg sign was negative bilaterally. Major muscle group testing of the BLE's was within normal limits. Deep tendon reflexes were physiologic in both lower extremities (Exhibit 3F/118). As well, although examination on August 18, 2015, revealed tenderness along the medial aspect of the left knee, there was no instability with varus/valgum, drawer, or Lachman's testing (Exhibit 2F/5). Thus, Dr. Cannone's opinion is inconsistent with and not supported by the objective medical evidence. Therefore, the undersigned finds Dr. Cannone's opinion non-persuasive.

(Tr. 24–25).

Relying on the vocational expert's testimony, the ALJ concluded that though the date last insured, Plaintiff was capable of performing past relevant work as a public health educator. This work did not require the performance of work-related activities precluded by Plaintiff's RFC. (Tr. 25). She therefore concluded that Plaintiff was not disabled within the meaning of the Social

Security Act, at any time from her alleged onset date of January 15, 2015, through September 30, 2015, the date last insured. (Tr. 26).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.    DISCUSSION

Plaintiff raises several assignments of error. First, she alleges that 42 U.S.C. § 902(a)(3), which limits the power of the President of the United States to remove the Commissioner of Social Security without cause, violates the separation of powers doctrine, and thus, the Commissioner's delegation of power to the ALJ who adjudicated her claim was defective. (Doc. 17 at 9–11). Second, she argues that the ALJ's conclusion that she did not have an impairment that met Listing

1.04 was not properly explained. (*Id.* at 13). Third, she challenges whether the ALJ's determination of her residual functional capacity is supported by substantial evidence. (*Id.* at 11–17). Finally, she claims that the ALJ's finding that she could perform past relevant work was not supported by substantial evidence. (*Id.* at 17–18). For the following reasons, the Court finds each assignment of error to be without merit.

### A. Separation of Powers

Plaintiff contends that remand is required because a statute that provided tenure protection to the former Commissioner of Social Security, Andrew Saul, violated the separation of powers doctrine, and therefore, the decision to deny her benefits was made by individuals who lacked a proper delegation of power to make benefits determination. This contention lacks merit.

#### 1. Plaintiff's Constitutional Claim is Procedurally Improper

As an initial matter, the claim is procedurally improper. Plaintiff's Complaint does not include any Constitutional claims. (Doc. 1). Rule 8(a)(2) of the Federal Rules of Civil Procedure provides, however, that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although a complaint need not provide "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At a minimum, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.* Here, the United States Supreme Court case upon which Plaintiff bases her Constitutional claim was decided on June 20, 2020. Yet Plaintiff gave no notice, let alone fair notice, of her Constitutional claim in her November 17, 2020 Complaint. *See John R. v Comm'r of Soc. Sec.*, Case No. C20-6176-MLP, 2021 WL 5356719, *7 (W.D. Wash. Nov. 16, 2021) (finding that a plaintiff failed to comply with Rule 8 by failing to plead a separation of

powers claim in complaint seeking judicial review of Commissioner's decision to deny benefits); *Shannon R. v. Comm'r of Soc. Sec.*, Case No. C21-5173, 2021 WL 5371394, at *6–7 (Nov. 18, 2021) (same).   For that reason, she failed to comply with Rule 8.

        2.       Plaintiff's Constitutional Claim Lacks Merit

But even if Plaintiff's Complaint was rule-compliant, her Constitutional claim lacks substantive merit.   Removal of the Commissioner is governed by 42 U.S.C. § 902(a)(3) which provides that the Commissioner may only be removed from office "pursuant to a finding by the President of neglect of duty, malfeasance in office."   *Id*.   The parties agree that two recent United States Supreme Court cases cast doubt on the constitutionality of that provision.

In *Seila Law LLC v. Consumer Financial Protection Bureau*, the Supreme Court held that a provision that allowed the president to remove the Director of the Consumer Financial Protection Bureau ("CFPB") only for "inefficiency, neglect of duty, or malfeasance of office," 12 U.S.C. § 5491(c)(3), violated the separation of powers doctrine by insulating the director from removal by the President.   140 S.Ct. 2183, 2197 (2020).   In *Collins v. Yellin*, decided one year later, the Supreme Court held that a provision limiting the President to removing the Director of the Federal Housing Finance Agency ("FHFA") only for cause similarly violated the separation of powers doctrine.   141 S.Ct. 1761, 1783 (2021) (holding that "*Seila Law* is all but dispositive").   Plaintiff asserts that like the Directors of the CFPB and the FHFA, the Commissioner of Social Security is a single officer at the head of an administrative agency, and therefore, §902(a)(3)'s attempt to impose any restraints on the President's power to remove the Commissioner also violates the separation of powers doctrine.   The Commissioner agrees.   (Doc. 21 at 9) (citing Office of Legal Counsel, U.S. Dep't of Justice, Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981542 (July 8, 2021)).

Plaintiff further asserts that because this removal provision is unconstitutional, any delegations of power by Former Commissioner Saul, including delegations of authority to ALJs or the Appeals Council who determined her benefits claims, were invalid. The Commissioner contends that Plaintiff's argument fails because the ALJ who determined Plaintiff's claim on March 4, 2020, held office on that date, not because of a delegation of authority from Former Commissioner Saul, but because of a ratification of delegated authority on July 16, 2018,[1] by Former Acting Commissioner Nancy Berryhill. (Doc. 21 at 11). And the Commissioner correctly notes that an Acting Commissioner is not subject to § 902(a)(3)'s removal provision, and therefore that provision's constitutionality, or lack thereof, is irrelevant. *See Collins*, 141 S.Ct. at 1781 (because the FHFA removal restrictions only applied to the Director, "any constitutional defect in the provisions restricting the removal of a confirmed Director would not have harmed [the plaintiffs], and they would not be entitled to any relief" from actions of the Acting Director who enjoyed no such removal protections); *Thomas E. v. Comm'r of Soc. Sec.*, C21-5107-BAT, 2021 WL 5415241, *5 (W.D. Wash. Nov. 19, 2021) (finding no constitutional injury where ALJ's appointment was ratified by Acting Director Berryhill who, as Acting Director, was not subject to the removal provision in § 902(a)(3)); *Alice T. v. Comm'r of Soc. Sec.*, 8:21CV14, 2021 WL 5302141, *18 (D. Neb. Nov. 15, 2021) (same); *Boger v. Kijakazi*, No. 1:20-cv-00331-KDB, 2021 WL 5023141, *3 n.4 (W.D.N.C Oct. 28, 2021) ("Plaintiff's constitutional 'removal restriction'

---

[1] In *Lucia*, the Supreme Court found that the United States Security Exchange Commission (SEC) ALJs were "inferior officers" under the Appointments Clause, U.S. Const. art II, § 2, cl. 2, and therefore, had to be appointed by a President, a court, or the head of an agency instead of lower-level staff. *Lucia v. S.E.C.*, 138 S.Ct. 2044, 2051 (2018). Although *Lucia* involved ALJs at the SEC, on July 16, 2018, Acting Commissioner Berryhill ratified the appointment of the Social Security Administration's ALJ's and administrative appeals judges who were previously appointed by lower-level staff in response to the ruling in *Lucia*. *See* SSR 19-1p, 84 Fed Reg. 9582 (2019).

argument is likely not even applicable to this case because [the ALJ] was appointed by an Acting Commissioner of Social Security who could be removed from the office at the President's discretion.") (emphasis in original).

Nevertheless, Plaintiff asserts that the ALJ and the Appeals Council adjudicated her disability application pursuant to a delegation of authority from Former Director Saul. (Doc. 25 at 3). The Court need not resolve this factual dispute but finds instead that even if Former Director Saul appointed the ALJ and Appeals Council judges who determined Plaintiff's benefits claim, the constitutionality of § 902(a)(3) would not warrant remand for several reasons.

First, even if the removal provision in § 902(a)(3) is unconstitutional, it would not have deprived Former Commissioner Saul of the ability to delegate power to others to decide Plaintiff's benefits claim because of the doctrine of severability. As the Supreme Court noted in *Seila Law*, "'one section of a statute may be repugnant to the Constitution without rendering the whole act void.'" 140 S.Ct. at 2208 (quoting *Loeb v. Columbia Twp. Trustees*, 179 U.S. 472, 490 (1900)). Indeed, even in the absence of a severability clause, when "'confronting a constitutional flaw in a statute, [the Supreme Court tries] to limit the solution to the problem, severing any problematic portions while leaving the remainder intact.'" *Id.* (quoting *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010)). For that reason, in *Seila Law*, the Supreme Court found that the unconstitutional removal provision was severable from the remainder of the CFPB's governing statutes because the CFPB was capable of functioning independently even if the unconstitutional removal provision was stricken. 140 S.Ct. at 2209–10, 2245. Such is the case here. If the removal provision in § 902(a)(3) is stricken, the Social Security Administration would remain fully functional. *Alice A. v. Comm'r of Soc. Sec.*, Case No. C20-5756, 2021 WL 5514434, *6 (W.D. Wash. Nov. 24, 2021) (finding that plaintiff's separation of powers claim failed, in part,

because even if § 902(a)(3) was unconstitutional it was severable from the remainder of the statutes governing the Social Security Administration); *Shaun A. v. Comm'r of Soc. Sec.*, Case No. C21-5003-SKV, 2021 WL 5446878, *4 (W.D. Wash. Nov. 22, 2021) (same); *John R. v Comm'r of Soc. Sec.*, 2021 WL 5356719, *8 (same).

In addition, even if the removal provision in § 902(a)(3) is unconstitutional, that would not have automatically rendered Former Commissioner Saul's appointment invalid, and thus, it would not have automatically invalidated his actions, including delegating authority to make benefits determinations or ratifying such delegations. In *Collins*, the Supreme Court found the unconstitutional removal provision did not render the FHFA's appointments invalid, and thus did not automatically void the FHFA's actions under the Director. 141 S.Ct. at 1787 ("Although the statute unconstitutionally limits the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the FHFA [that were challenged on appeal] as void."). Accordingly, infirmities in removal provisions do not automatically void appointments or actions taken by properly appointed officials. *Alice A. v. Comm'r of Soc. Sec.*, 2021 WL 5514434, *6 (finding that '[t]he infirm *removal* provision does not render Commissioner Saul's *appointment* invalid, which in turn does not render the ALJ's disability determination void.") (emphasis in original); *John R. v Comm'r of Soc. Sec.*, 2021 WL 5356719, *8 (finding that the unconstitutional "removal provision does not render the Commissioner's appointment invalid, and thus does not automatically void the SSA's actions under the Commissioner").

Instead, to obtain reversal of an agency decision, a plaintiff must show "compensable harm" flowing from an unconstitutional removal clause. *Collins*, 141 S.Ct. at 1788–89 (remanding for further proceedings to determine whether compensable harm to Plaintiff occurred due to the

President's inability to remove a Director of the FHFA except for cause). Here, Plaintiff makes no such showing. Plaintiff asserts that her injuries flow from an illegitimate delegation of power, and this "means that a presumptively inaccurate legal standard was utilized by the ALJ to adjudicate this claim." (Doc. 17 at 10). However, she points to no particular legal standard promulgated by Former Commissioner Saul that was utilized by the ALJ in reaching the adverse decision. Further, as explained above, the actions of the SSA and its adjudicators, including their accepted legal standards, are not rendered invalid by an unconstitutional removal provision.

In short, Plaintiff has not pointed to a connection between any unconstitutional limit on Former Director Saul's removal and the ALJ's determination denying her benefits. *See also Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1138 (9th Cir. 2021) (finding that "there is no link between the ALJ's decision awarding benefits and the allegedly unconstitutional removal provisions. And nothing commands us to vacate the decisions below on that ground."). Nor is it likely that Plaintiff could do so, given that any particular ALJ or Appeals Council decision would not concern the President. *Cf. Collins*, 141 S.Ct. at 1802 (Kagan, J. concurring) ("The SSA has a single head with for-cause removal protection . . . But . . . I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone . . . . When an agency decision would not capture a President's attention, his removal authority could not make a difference.").

For all these reasons, the Court finds that Plaintiff's separation of powers claim lacks merit. Accordingly, the Court does not reach the Commissioner's alternative arguments including harmless error, de facto officer, the rule of necessity, and other prudential considerations.

## B. Listing 1.04

Plaintiff alleges that the ALJ, in finding that Plaintiff did not meet the criteria set out in

Listing 1.04 "failed to provide sufficient information justifying her findings so this Court can facilitate meaningful judicial review." (Doc. 17 at 13). The Court finds this allegation of error without merit.

At step three, an ALJ must compare a claimant's impairments to an enumerated list of medical conditions that the Social Security Administration has deemed "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). Each Listing describes "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3). The claimant bears the burden of showing that his impairment meets or medically equals a Listing. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

Listing 1.04, which was in effect at the time the ALJ issued her unfavorable determination, dealt with spinal disorders. It provided the definition of such disorders as follows:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular

pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. Significantly, Plaintiff does not allege that the evidence supports that she meets the definition of the listing, only that the ALJ's conclusion that she did not was too perfunctory. (Doc. 17 at 13).

In assessing the listing, the ALJ concluded that Plaintiff "was not so functionally limited and the evidence does not support the required medical findings required by listing 1.04 such as a condition that resulted in compromise of a nerve root with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication established by findings on appropriate medically acceptable imaging and manifested by chronic pain and weakness." (Tr. 20). While the ALJ did not describe the entirety of the evidence in the same paragraph, she would proceed to weigh the evidence related to Plaintiff's spine in detail when she crafted the RFC, as will be more fully described below. The ALJ's careful evaluation of the evidence makes clear that there was not sufficient supporting evidence to conclude that Plaintiff met the listing. Moreover, the Sixth Circuit recognizes that any error with respect to an ALJ's step-three analysis is harmless unless the claimant can establish that she satisfied the listing in question. *Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359, 366 (6th Cir. 2014); *see also Chappell v. Comm'r of Soc. Sec.,* No. 1:14–cv–1005, 2015 WL 4065261, at * 4 (W.D. Mich. July 2, 2015). As previously described, Plaintiff does not attempt to establish that she satisfied Listing 1.04. Accordingly, the Court finds that this allegation of error lacks merit.

### C. Plaintiff's RFC

The ALJ determined that Plaintiff had the RFC "to perform light work as defined in 20 CFR 404.1567(b) except frequent climbing of ramps and stairs, balancing, stooping, kneeling,

crouching, and crawling; and occasional climbing of ladders, ropes, or scaffolds."  (Tr. 20).

Plaintiff argues that this RFC is not supported by substantial evidence, and the ALJ failed to

properly account for Plaintiff's pain, and its effect on her ability to sit, stand, and lift.  (Doc. 17 at

13–14).

The ALJ alone is responsible for determining a Plaintiff's residual functional capacity.  *See*

20 C.F.R. § 404.1546(c).  While medical source opinions are considered, the final responsibility

for deciding the RFC is reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d); *Coldiron v.*

*Comm'r of Soc. Sec.*, 391 F. App'x. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs

that the ALJ—not a physician—ultimately determines a claimant's RFC.").   An RFC

determination is a legal decision rather than a medical one, and the development of a claimant's

RFC is solely within the province of an ALJ. *See* 20 C.F.R. §§ 404.1527(e), 405.1546; *Poe v.*

*Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (stating that the responsibility for

determining a claimant's RFC rests with the ALJ, not a physician).

First, Plaintiff points to her own testimony (Doc. 17 at 13), in which she stated that when

she sits it feels like "sitting on bricks," and for her to sit for two or three hours would be "asking

an awful lot."  (Tr. 53).  She further testified that standing for thirty minutes would irritate her back

to the extent that she would need to sit down, and that lifting was difficult, especially with her right

hand.  (Tr. 54–55).  The ALJ considered all the same in crafting the RFC, noting that Plaintiff:

> testified that she is presently able to sit except that it feels like she is sitting on
> bricks . . . . She further testified that she could only stand for so long, but off the
> top of her head could not quantify for how long, but later assumed she could stand
> for 30 minutes when asked by her attorney. . . . She further testified to problems
> lifting due to right wrist.

(Tr. 21).  Ultimately, however, the ALJ determined that these statements about the "intensity,

persistence, and limiting effects of [Plaintiff's] degenerative disc disease [were] inconsistent with

and not supported by the objective medical evidence of record in its entirety . . . ." Thus, considering both Plaintiff's allegations and the objective medical evidence, the ALJ crafted the RFC for light work with noted exceptions. (Tr. 24).

Regarding the objective medical evidence, Plaintiff does not identify any significant material that the ALJ overlooked in reaching her decision. Plaintiff notes an EMG test which she argues the ALJ "acknowledged receipt of . . . but failed to analyze or discuss." (Doc. 17 at 15 (citing Tr. 15–16)). But in fact, the ALJ noted the "EMG & NCV examination that . . . revealed decrease in conduction velocity in the left and right peroneal motor, and left tibial motor" while additionally noting that "despite [that] examination . . . all needle EMG studies and all other sensory/motor NCV studies were within normal limits." (Tr. 18 (citing Tr. 609)). Ultimately, Plaintiff identifies the same records discussed by the ALJ, noting that throughout those records Plaintiff self-reported that she was in pain. (Doc. 17 at 14). Yet, the ALJ found the objective evidence within those records supported her designated RFC, and upon review of her opinion and the medical evidence, the Court finds that determination is supported by substantial evidence.

The ALJ noted that at the alleged onset of disability, January 15, 2015, Plaintiff had suffered a fall at work and began treatment for associated pain—primarily chiropractic treatment. (Tr. 22). Plaintiff's chiropractor reported that she responded well to rehabilitation and conservative treatment, ultimately improving her prognosis from "guarded" to "good." (Tr. 22–23 (citing Tr. 345, 311, 313–14, 319, 321, 323–31, 336–42, 345, 348–49, 351, 353–54, 359, 361, 363, 365, 367, 369–72, 377, 379, 381, 383, 385, 387, 389, 391, 393, 396, 398, 404, 406, 334)). The ALJ also detailed Plaintiff's independent medical consultation with Dr. David D. Louis for a worker's compensation claim in June 2015. He found that though she had a straight leg raise test which was positive for pain in her left buttock, the test was negative for radiculopathy. (Tr. 23

(citing Tr. 410)). He further noted that Plaintiff's reported sacroiliac tenderness was subjective in nature. (*Id.* (citing Tr. 411)). Dr. Louis believed Plaintiff's prognosis was "good" and that she had reached maximum medical improvement as directly related to the fall she suffered at work. (*Id.* (citing Tr. 412–13)).

In August 2015, Plaintiff visited the emergency department at Mount Carmel East, where examination revealed "no midline cervical/thoracic/lumbar sacral tenderness to palpation[,]" and a straight leg raise test that was negative bilaterally. (*Id.* (citing Tr. 273)). In a visit with Dr. Michael Cannone later that month, Plaintiff did not complain of back pain. (*Id.* (citing Tr. 288)). In September 2017, Plaintiff received an MRI of her lumbar spine "which showed no disc herniations, no impingement on the thecal sac, and the neural foramina were patent." (Tr. 23–24 (citing Tr. 451)). The ALJ found this diagnostic testing did not support the severity of claimant's alleged symptoms. (Tr. 23). Taken together, the ALJ detailed substantial evidence to support her determination that Plaintiff, despite her testimony about her pain, was capable of light work.

At base, Plaintiff asks this Court to re-weigh the evidence relating to her impairments and decide the outcome of this case differently. This request is impermissible under the substantial evidence standard of review. The Court may not undertake *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Young v. Sec'y of Health and Human Servs.*, 787 F. 2d 1064, 1066 (6th Cir. 1986). Accordingly, because the ALJ's RFC determination is supported by substantial evidence, Plaintiff's assignment of error is without merit.

### D. Past Relevant Work

Plaintiff alleges that substantial evidence does not support the ALJ's determination that she could perform her past relevant work as a Public Health Educator. (Doc. 17 at 11, 17–18).

Namely, she says the ALJ failed to consider "whether the effects of her pain symptoms would interfere with her ability to perform her past work." (*Id.* at 14). Significantly, "[t]hrough step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work[.]" *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

Plaintiff notes that initially "[t]his matter arose out of a claim for work[-]related injury[,]" after she suffered a fall at work. (Doc. 17 at 11). Plaintiff maintains that the ALJ considered only evidence demonstrating that she was capable of returning to work "as directly related to the injury only," without considering whether pain from "non-injury[-]related problems would limit Plaintiff from performing full duty work." (*Id.* at 16). For supporting objective medical evidence, Plaintiff offers only that Dr. David D. Louis, who conducted the independent medical examination for Plaintiff's worker's compensation claim, noted that previous medical records indicated x-rays which showed evidence of degenerative disc disease at L5/S1 and scoliosis. (*Id.* (citing Tr. 412)). She says this bolsters her allegations of "radiating neck pain with numbness in her hands and trouble picking up items along with pain which limited her sitting, standing, and lifting. (Doc. 25 at 2 (citing Tr. 53–55)). The Court finds this allegation of error is without merit.

First, the ALJ summarized Plaintiff's hearing testimony, noting that Plaintiff stated "she stopped working in January 2015 due to pain she was experiencing, which prevented her from being able to perform her job duties." (Tr. 20). She further described that Plaintiff, explaining why she did not return to work after being cleared for injury related to the fall, "said she had pain and could not sleep and therefore could not get out of bed." (Tr. 21). In other words, the ALJ understood that Plaintiff was reporting pain outside the scope of her work-related fall. Further, the ALJ noted the specific piece of objective evidence Plaintiff identifies as supporting the pre-

existing pain: the prior x-rays which Dr. Louis said "indicate[d] . . . degenerative disc disease at the L5-S1 level and scoliosis" and "were likely to have pre-existed [Plaintiff's] January 15, 2015 injury." (Tr. 21, 23 (citing Tr. 412)).

Put simply, the ALJ considered Plaintiff's self-reported symptoms of pain unrelated to her fall at work, and what Plaintiff has identified as the supporting medical evidence of those symptoms. Yet, the ALJ reached a different conclusion than Plaintiff regarding the severity of those symptoms and their impact on her ability to perform past relevant work. The ALJ found that Plaintiff's "medically determinable degenerative disc disease could reasonable have been expected to cause symptoms" but Plaintiff's "statements concerning the intensity, persistence and limiting effect of the symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." (Tr. 22).

The ALJ supported her conclusion with substantial evidence. As described above, the ALJ considered that Plaintiff's chiropractor reported that she responded well to rehabilitation and conservative treatment, ultimately improving her prognosis from "guarded" to "good." (Tr. 22–23 (citing Tr. 345, 311, 313–14, 319, 321, 323–31, 336–42, 345, 348–49, 351, 353–54, 359, 361, 363, 365, 367, 369–72, 377, 379, 381, 383, 385, 387, 389, 391, 393, 396, 398, 404, 406, 334)). Examination of Plaintiff's back during an emergency department visit in August 2015 "revealed no midline cervical/thoracic/lumbar sacral tenderness to palpation" and at a doctor's visit that same month, Plaintiff "did not complain of low back pain." (Tr. 23 (citing Tr. 273)). An "MRI of [Plaintiff's] lumbar spine was performed on September 15, 2017, which showed no disc herniations, no impingement on the thecal sac, and the neural foramina were patent." (Tr. 23–24 (citing Tr. 451)). And ultimately, the ALJ accepted as persuasive the vocational expert's testimony

that Plaintiff could perform her past relevant work as a public health educator.  (Tr. 25–26, 68–69).

Simply put, the ALJ thoroughly considered Plaintiff's allegations of pain, particularly as they related to Plaintiff's supporting evidence of degenerative disc disease at the L5/S1 region, and her decision that Plaintiff could perform past relevant work was supported by substantial evidence.  Accordingly, Plaintiff's allegation of error is without merit.

## IV.    CONCLUSION

Based on the foregoing, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

IT IS SO ORDERED.


Date:   February 9, 2022                              /s/ Kimberly A. Jolson
                                                     KIMBERLY A. JOLSON
                                                     UNITED STATES MAGISTRATE JUDGE